UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:11-CR-65-ART-HAI |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| ROBERT DALE LEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court, on referral, considers a motion to suppress.  In sum, this is a case about legitimate law enforcement objectives pursued in an illegitimate way.  Eight months after receiving a tip that Defendant was engaged in marijuana trafficking, law enforcement attached a global positioning tracking device on Defendant's car, believing that the law allowed for the installation of that device without a warrant.  That belief turned out to be wrong.  Although the Supreme Court held that such a warrantless installation of a tracking device violates the Fourth Amendment *after* the investigation giving rise to this case, the exclusionary rule applies and requires the suppression of evidence obtained through the installation and use of that tracking device.  Unfortunately, the cost of suppression is high—Defendant was found with large quantities of marijuana and made damaging admissions, which support a Class A felony marijuana trafficking charge.  Defendant's criminal history category, previously determined by this Court to be the worst possible under the Guidelines, underscores Defendant's propensity for dangerous criminal behavior.  Indeed, Defendant admitted to marijuana trafficking while on supervised release from a previous Judgment of this Court.

For a variety of reasons, however, the deterrence benefits of suppression outweigh its heavy costs. This is so primarily because no unequivocal precedent allowed for the warrantless installation of the tracking device. Instead, law enforcement **_interpreted_** various cases to support their decision not to seek a warrant. Of course, it is the business of the courts to interpret the law. In the absence of unequivocal precedent allowing for the government's installation of the tracking device, suppression is necessary. Thus, as more fully described below, having reviewed the evidence, briefs, and arguments submitted by counsel, the Court **RECOMMENDS** that the District Court **GRANT** the motion to suppress.

## I.   PROCEDURAL BACKGROUND

Defendant Robert Dale Lee filed a motion to suppress (D.E. 13) on October 26, 2011, the United States responded (D.E. 15), and the Court conducted an evidentiary hearing as promptly as possible on November 7, 2011. (D.E. 16). Supplemental briefs were filed following that evidentiary hearing, and then again to address an applicable opinion of the Supreme Court that was anticipated by the parties, but rendered earlier than expected on January 23, 2012. (D.E. 20, 23, 24, 26, 27, 29, 31, 32). The motion to suppress became ripe on February 10, 2012, and was referred to the undersigned for a recommended disposition. (*See* D.E. 12-1 at 9).

## II.   FACTS

During a proffer session conducted on December 21, 2010, Oba Layton Champlin, a defendant in a different case pending in this Court, advised DEA Task Force Officer (TFO) Brian Metzger and Special Agent Vince Kersey that he had purchased one pound of marijuana from Defendant in the summer of 2010. (Hr'g Tr. 10, Nov. 7, 2011, D.E. 18). Champlin also stated that Marty Stewart had told him that Defendant frequently traveled to Chicago to obtain

marijuana, and that Defendant once asked Champlin if he wanted to go with Defendant to Chicago. (*Id.*).

On Friday, September 2, 2011—more than eight months after Champlin provided this tip to Metzger and Kersey—Defendant reported to the U.S. Probation Office in London, Kentucky, to finalize paperwork for his last day of supervised release on an unrelated criminal conviction. (*Id.* at 11-12). While Defendant was meeting with his probation officer, Metzger installed a "global position-type tracker" on Defendant's vehicle.[1] (*Id.* at 10-12). The tracker, which was deployed while the vehicle was in a public parking spot at the Laurel County Fiscal Court, could identify and transmit to Metzger the vehicle's location (in real-time), the vehicle's speed, and could track the location of the vehicle as it moved from place to place. (*Id.* at 13). Metzger utilized the tracker for a four-day period, all without Defendant's knowledge or consent, and all without authorization from a judge. (*Id.* at 20).

The first weekend after the tracker was installed, Defendant's vehicle stayed in the Corbin, Kentucky area. (*Id.* at 13). On September 5, however, the tracker located in Chicago for a four- to five-hour period before heading south towards Kentucky on September 6.[2] (*Id.* at 14). Once Metzger realized that Defendant's vehicle was likely heading to Kentucky, he coordinated a traffic stop with Trooper Matt Hutti, a canine officer with the Kentucky State Police. (*Id.*). Metzger advised Hutti that Defendant's vehicle was "probably" going to contain marijuana, provided a description of the vehicle, and identified the vehicle's tag number. (*Id.* at 14, 23). He also told Trooper Hutti that "he would have to obtain his own PC, probable cause, for a traffic

---

[1]     Defendant's vehicle was actually owned by Defendant's employer—Cumberland Falls Auto Sales. However, the undisputed evidence reflects that Defendant was using the vehicle with permission of the owner and that Defendant was a bailee of the vehicle. *See, e.g.*, *Jones*, 565 U.S. ----, 132 S. Ct. 945, 949 n.2 (2012) (suggesting, but not deciding, that a bailee of a vehicle has a sufficient property interest in the vehicle to challenge the installation of a GPS device).

[2]     By this time, Defendant's term of supervised release had expired.

stop." (*Id.* at 14). According to Metzger, this meant that Hutti could not stop the vehicle simply because Metzger believed the vehicle contained contraband. (*Id.*).

When Defendant, who was traveling south on I-75, had reached the Richmond/Lexington area, Metzger started following Defendant's vehicle. (*Id.* at 22, 24, 29). As Defendant got close to the location in Mount Vernon where Hutti had situated his canine unit, Metzger called Hutti and told him that Defendant was getting close to his location. (*Id.* at 24-25). When Defendant passed the canine unit, Hutti observed that Defendant was not wearing a safety belt. (*Id.* at 33). According to Hutti, he "effected a traffic stop on Mr. Lee for" committing this primary traffic violation under Kentucky law. (*Id.* at 33-34).

During the traffic stop, Hutti made a passenger-side approach on Defendant's vehicle. (*Id.* at 35). Defendant provided Hutti with his driver's license. (*Id.*). Because Defendant's hand was shaking uncontrollably when he turned over his license, Hutti asked Defendant to step out of the vehicle. (*Id.*). Trooper McCowan, another canine officer that had arrived during the traffic stop, ran a check on Defendant's license. (*Id.* at 36-37). While doing so, Hutti asked Defendant whether he had any illegal contraband in the vehicle. (*Id.* at 37). According to Hutti, the following exchange occurred:

> At that point he told me yes, he had two marijuana cigarettes up in the ashtray of his vehicle. And he said, "You can go up and get it; I can go up and get it for you." And while Trooper McCowan was still checking his driver's license, I asked him, "So you have no problem with me going up there and searching your vehicle," and he said, "Absolutely not."

(*Id.*). Hutti then obtained his canine who performed an exterior search of Defendant's vehicle. The "dog alerted on the car for the positive odor of narcotics."[3] (*Id.* at 39). This all took place

---

[3] Hutti's dog alerts to the odor of narcotics in an aggressive manner. (Hr'g Tr. 52). "He scratches on the vehicle, or uses his paws to scratch to indicate where the odor's coming out of the vehicle at." (*Id.*). According to Hutti, he trains his canine almost every shift and, at the time of the canine's positive alert on September 6, the dog was certified by the Kentucky State Police to detect the odor of narcotics.

within the matter of three to four minutes after the stop began.  (*Id.* at 39-40).  McCowan's canine also performed an exterior search of the vehicle and positively alerted to the presence of narcotics.  (*Id.* at 40).

Following these positive alerts, Hutti and McCowan performed a search of the vehicle and found approximately 150 pounds of marijuana.  (*Id.* at 17, 40-41).  Metzger arrived on scene, placed Defendant in his vehicle, advised Defendant of his *Miranda* rights, and started interviewing Defendant.  (*Id.* at 17).  Metzger transported Defendant to the London DEA office where the interview continued.  (*Id.*).  Arguing that his Fourth Amendment rights were violated, Defendant has moved to suppress the evidence seized by law enforcement officers on September 6, 2011, and any statements[4] made by Defendant to law enforcement officers following the traffic stop.  (D.E. 13 at 1).

## III.  ANALYSIS

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend IV.  "A warrantless search or seizure is *per se* unreasonable under the Fourth Amendment . . . ."  *United States v. Pearce*, 531 F.3d 374, 379-80 (6th Cir. 2008) (quoting *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994)).  Defendant argues that a warrantless search and seizure occurred on two occasions: (1) when Metzger installed the GPS tracker on Defendant's vehicle and (2) when Hutti stopped Defendant's vehicle and looked inside the vehicle for contraband.

---

(*Id.* at 32).  McCowan's canine alerts to the odor of narcotics in a similar manner and was also certified in narcotics detection on September 6.  (*Id.* at 54-55).

[4]     The record reflects that Defendant admitted to purchasing over 1000 pounds of marijuana, including some 230 pounds during a term of supervised release imposed by a previous Judgment of this Court.  (D.E. 1-1 at 4).

### A. Installation and Use of GPS Tracker

Here, based upon a very recent Supreme Court decision, the parties no longer dispute that law enforcement officers performed a search within the meaning of the Fourth Amendment when they affixed a GPS tracker to Defendant's vehicle and monitored his location over a four-day period. *See United States v. Jones*, 565 U.S. ----, 132 S. Ct. 945, 949 (2012) ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" (footnote omitted)). In fact, the United States now concedes that the installation and use of the GPS tracker without judicial authorization was unconstitutional. (D.E. 31 at 1). The Court addresses the appropriate remedy for this constitutional violation below. *See infra* pp. 9-21.

### B. Stop and Search of Vehicle

Law enforcement officers also seized Defendant and searched his vehicle without a warrant when they performed a traffic stop on the vehicle he was driving and when they entered the vehicle looking for contraband. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."). Initially, Defendant argued that the stop and search of his vehicle was impermissible under the Fourth Amendment because it was a "pure pretext[ual] stop," (Hr'g Tr. 7), and on grounds that the seizure was not limited in scope and duration, (D.E. 13-1 at 2).

After the United States presented its evidence supporting the stop and search of the vehicle,[5] however, Defendant appears to have abandoned those aspects of his motion to suppress. After all, law enforcement officers are permitted to stop a vehicle without a warrant

---

[5]     The United States acknowledged its burden to present all evidence to support any theory legitimizing the stop and search. (D.E. 18 at 7).

"[i]f there is probable cause to believe a traffic violation had occurred." *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). The undisputed evidence was that Defendant committed a traffic violation by failing to wear his safety belt. Thus, Hutti was permitted to stop Defendant's vehicle ***regardless of his subjective motivation in doing so***. *See United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) ("The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop."); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle.").

When performing a traffic stop, "the officer must conduct the stop with the least intrusive means reasonably available and not detain the individual longer than necessary to effectuate the purpose of the stop, unless the officer has an articulable reasonable suspicion that the individual is engaged in criminal activity." *Hill*, 195 F.3d at 267. However, the officer may order the driver out of the vehicle without violating the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). Furthermore, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Likewise, "[t]he Fourth Amendment does not require reasonable suspicion to justify using a

drug-detection dog as long as the traffic stop and detention are not unlawful or improperly extended." *United States v. Bell*, 555 F.3d 535, 549 (6th Cir. 2009). Generally, "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop." *Id.* at 541 (quotation omitted).

Based upon the foregoing, Hutti did not violate the Fourth Amendment by performing the traffic stop, requesting that Defendant exit his vehicle, questioning Defendant about contraband in his vehicle, or using his drug-detection dog because such activities did not cause Defendant to be detained any "longer than necessary to effectuate the purpose of the stop." *Hill*, 195 F.3d at 267. These activities all occurred within three to four minutes of the initial stop and all while McCowan was making record checks via radio on Defendant's license.

The warrantless search of Defendant's vehicle also did not violate the Fourth Amendment. One exception to the warrant requirement—the so called "automobile exception"—permits a warrantless search of an automobile if there is "probable cause to believe that instrumentalities or evidence of crime may be found in the vehicle to be searched." *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001). Significantly, "an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle." *Hill*, 195 F.3d at 273. Thus, when Hutti's and McCowan's properly trained and reliable dogs[6] both alerted to the presence of narcotics in Defendant's vehicle, Hutti and McCowan could search the vehicle without a warrant.

---

[6]     Hutti's and McCowan's testimony regarding their canines' training and certification is undisputed.

### C.   Exclusionary Rule

The primary issue before the Court is the appropriate remedy for the installation and use of the GPS tracking device in violation of the Fourth Amendment.  The exclusionary rule generally requires the exclusion of evidence that is "directly" or "primarily" discovered as the result of an unlawful search.  6 Wayne R. LaFave, *Search and Seizure* § 11.4 (4th ed. 2004). Stated another way, the exclusionary rule prohibits the "introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (internal citation omitted).  At the post-*Jones* status conference conducted on January 30, 2012 (D.E. 30), the United States acknowledged that the GPS data and testimony related thereto represents the "direct" and "primary" evidence discovered as a result of the installation of the GPS device.  The United States further represented that it will not introduce the GPS data itself, or testimony concerning that data, at trial.

However, the exclusionary rule is not limited to the suppression of "direct" and "primary" evidence.  Under the fruit of the poisonous tree doctrine, the exclusionary rule also "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Id.* at 536-37 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

1.      **Attenuation Doctrine**

Despite the apparent breadth of the exclusionary rule, it is not without limitations.

Indeed, suppression of evidence should not be a court's first impulse.  *Hudson v. Michigan*, 547

U.S. 586, 591 (2006).

> Real deterrent value is a necessary condition for exclusion, but it is not a
> sufficient one.  The analysis must also account for the substantial social costs
> generated by the rule.  Exclusion exacts a heavy toll on both the judicial system
> and society at large.   It almost always requires courts to ignore reliable,
> trustworthy evidence bearing on guilt or innocence.  And its bottom-line effect, in
> many cases, is to suppress the truth and set the criminal loose in the community
> without punishment.  Our cases hold that society must swallow this bitter pill
> when necessary, but only as a last resort.  For exclusion to be appropriate, the
> deterrence benefits of suppression must outweigh its heavy costs.

*Davis v. United States*, 564 U.S. ----, 131 S. Ct. 2419, 2427 (2011) (quotations and citations

omitted).   Therefore, "exclusion may not be premised on the mere fact that a constitutional

violation was a 'but-for' cause of obtaining evidence."  *Hudson*, 547 U.S. at 592.

Under what has become known as the "attenuation doctrine," "but-for cause, or causation

in the logical sense alone, can be too attenuated to justify exclusion."  *Id.* (quotation and citation

omitted).  Attenuation can occur "when the causal connection is remote.  Attenuation also occurs

when, even given a direct causal connection, the interest protected by the constitutional

guarantee that has been violated would not be served by suppression of the evidence obtained."

*Id.* (citation omitted).

"Generally, the attenuation doctrine is used to support the admission of evidence in three

general categories. These include the admission of voluntary confessions obtained after illegal

arrests, the admission of evidence obtained during consensual searches following illegal seizures,

or the admission of voluntary confessions given after *Miranda* warnings where an earlier

confession was obtained before the defendant was advised of his fifth amendment rights."

*United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (internal citations omitted).  The Supreme Court has also applied the attenuation doctrine to "a witness' testimony at trial where the identity of the witness was discovered during an unlawful search."  *Id.* (citing *United States v. Ceccolini*, 435 U.S. 268, 280 (1978)).  Courts have also recognized that the attenuation doctrine may permit police to perform a search incident to arrest following an impermissible traffic stop where police come to learn, during the unlawful seizure, that an arrest warrant has been issued for an occupant of the vehicle.  *Id.*  Similarly, "[i]f a suspect's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime.'"  *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)) (internal brackets omitted).

There is no bright-line rule for the application of the attenuation doctrine.  Instead, courts are to look to three factors when evaluating whether evidence has been sufficiently purged of the taint from an unlawful search or seizure: "'the temporal proximity of the unlawful [search] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct."  *Hudson*, 547 U.S. at 592 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)) (internal brackets omitted). Ultimately, the Court must assess whether the "evidence sought to be introduced . . . 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *United States v. Williams*, 615 F.3d 657, 668-69 (6th Cir. 2010) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  "It is the government's burden to show that evidence is not 'fruit of the poisonous tree."  *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (quotation omitted); *see also United States v. Albert*, 579 F.3d 1188 (10th Cir. 2009) ("the government must prove the evidence sought to be suppressed is not fruit

of the poisonous tree" (quotation omitted)); *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003) ("The burden of proving attenuation rests with the prosecution.").

Here, Defendant argues that law enforcement officers would never have known Defendant's location, and would have been unable to coordinate a traffic stop, but for the unlawful installation of the GPS tracker. (D.E. 29 at 4). As a result, Defendant contends that the contraband seized during the stop, as well as statements he made to law enforcement following the stop, must be suppressed under the fruit of the poisonous tree doctrine. (*Id.*). The United States, on the other hand, argues that the stop, search, and interrogation were not the product of the installation of the GPS tracker, but, instead, were the product of an "independent" traffic violation committed by Defendant. (D.E. 31 at 2).

*a.*          *Temporal Proximity*

First, the Court is required to assess the temporal proximity of the unlawful search and "the emergence of the incriminating evidence at issue." *Hudson*, 547 U.S. at 592. This factor "must be considered in light of the conditions and circumstances that occurred during the time frame in question." *United States v. Shaw*, 464 F.3d 615, 628 (6th Cir. 2006). In this case, there was no significant lapse in time between the illegal search and the subsequent stop of Defendant's vehicle. It is true that the ***installation*** of the GPS tracking device took place four days before the stop. However, pursuant to *Jones*, it is not simply the installation of the device that is impermissible. Instead, it is the installation of the device and "**use of that device to monitor the vehicle's movements**" that "constitutes a 'search.'" *Jones*, 132 S. Ct. at 949 (emphasis added). Law enforcement ***used*** the GPS data in various ways. In particular, the information revealing that the vehicle was in Chicago triggered a heightened focus, a belief in possible criminal behavior, and subsequent planning to hopefully intercept Defendant's vehicle.

The search continued throughout the entire period that the tracker was generating data as to the location of Defendant's vehicle, including Metzger's reliance on that data to indicate to Hutti that the vehicle was getting close.   In light of the limited temporal proximity between the use of the GPS device and the stop and subsequent search of Defendant's vehicle, this factor does not favor attenuation.

**b.**          ***Intervening Circumstances***

The next factor looks to "the presence of intervening circumstances."  *Hudson*, 547 U.S. at 592.  The type of events "that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence.  *Shaw*, 464 F.3d at 628-29 (quoting *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003)).  The United States argues that the failure of Defendant to wear his seatbelt in violation of Kentucky law constituted an intervening circumstance.[7]  (D.E. 31 at 2-3).

Although not controlling, the district court's decision in *United States v. Lopez*, No. 10-67-GMS, 2011 WL 2636890 (D. Del. July 6, 2011), is instructive on this issue.  In *Lopez*, law enforcement officers in Wilmington, Delaware suspected Lopez of selling heroin.  *Lopez*, 2011 WL 2636890, at *1.  Officers enhanced their physical surveillance of the defendant with the use of a GPS tracking device that they installed on Lopez's vehicle without judicial authorization.  *Id.* at *1-*2.  Using the GPS data, officers were able to determine that Lopez was heading towards Philadelphia and they suspected he was planning to acquire heroin there.  *Id.* at *2.  A team of detectives was assembled to conduct a traffic stop upon Lopez's return to Wilmington.

---

[7]          There are arguably other intervening circumstances that were present, such as Defendant's consent to search the vehicle and Defendant's waiver of his *Miranda* rights.  However, the United States, who has the burden on this issue, did not raise those arguments in its brief and Defendant did not have the opportunity to respond to such arguments.  Therefore, the Court does not address the impact of those potentially intervening circumstances here.

*Id.* They also arranged for a drug canine officer to be available. *Id.* Before the detectives were able to make the traffic stop, however, a patrol officer, who was in no way involved in the investigation, clocked Lopez traveling 91 miles per hour in a 55 mile per hour zone and pulled the vehicle over. *Id.* Lopez argued that evidence discovered during a subsequent search of the vehicle should have been suppressed because the evidence was fruit of the unlawful installation of the GPS device. In that case, the traffic violation was considered an intervening circumstance because "**Lopez's decision to drive 91 miles per hour in a 55 miles per hour zone can hardly be attributed to the . . . detectives**." *Id.* at *5 (emphasis added).

Likewise, Defendant's failure to wear his safety belt was an intervening circumstance because his conduct was in no way caused by, or otherwise attributable to, the actions of law enforcement. However, an intervening traffic violation does not ***automatically*** remove the taint of earlier unlawful conduct by the police. On the contrary, lawful police conduct, such as an arrest pursuant to a warrant and a subsequent search incident to that arrest, may nevertheless be the fruit of earlier unlawful conduct. *See, e.g.*, *United States v. Gross*, 662 F.3d 393, 401-07 (6th Cir. 2011).

The *Gross* case provides critical guidance. There, a police officer observed an automobile in the parking lot of a housing complex in a high-crime area. *Id.* at 396. The engine was running, but the vehicle had no apparent driver, and had a passenger that was slumped down in the front seat. *Id.* The officer performed a check on the vehicle's license plate and found no outstanding warrants or issues related to the owner of the car. *Id.* The officer then parked his police cruiser directly behind the automobile and approached the passenger. *Id.* The officer asked the passenger to identify himself. *Id.* A warrant check on the name revealed that the passenger had a warrant out for his arrest. *Id.* at 397. The officer arrested the passenger and

14

transported him to the local jail.  *Id.*  After allowing the passenger to use the restroom, officers determined that the passenger left a .380 caliber firearm near the toilet and they arrested him on firearms charges.  *Id.*

At trial, the passenger moved to suppress evidence of the firearm because he was being unlawfully detained when the police officer blocked in and approached the vehicle to ask questions.  *Id.*  The Sixth Circuit agreed and found that there was an insufficient justification for the *Terry* stop.  *Id.* at 401.  The Sixth Circuit also concluded that the firearm should have been suppressed as a fruit of the unlawful seizure.  *Id.* at 406.  In analyzing the "intervening circumstances" factor, the court first pointed out that, "where there is a stop with no legal purpose, the discovery of a warrant during that stop may be a relevant factor in the intervening circumstance analysis, but it is not by itself dispositive."  *Id.* at 404.  "To hold otherwise," the court reasoned,

> would create a rule that potentially allows for a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a "police hunch" that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion.  Despite a lack of reasonable suspicion, a well-established constitutional requirement, the officer may then seize those individuals, ask for their identifying information (which the individuals will feel coerced into giving as they will have been seized and will not feel free to leave or end the encounter), run their names through a warrant database, and then proceed to arrest and search those individuals for whom a warrant appears.  Under this scenario, an officer need no longer have reasonable suspicion o[r] probable cause, the very crux of our Fourth Amendment jurisprudence.

*Id.* at 404-05.  Likewise, "holding that the discovery of a warrant after an illegal stop is always a taint-removing intervening circumstance . . . would create perverse incentives.  We do not wish to create a system of post-hoc rationalization through which the Fourth Amendment's prohibition against illegal searches and seizures can be nullified."  *Id.* at 405.  Ultimately, the court concluded that the intervening circumstance in that case—the discovery of the arrest warrant—

did not favor attenuation because the officer "had no particularized and objective basis for suspecting Gross of criminal activity at the time of the stop. *Id.*

Just as the officer in *Gross* had no lawful purpose to seize the passenger, the installation and use of the GPS device on Defendant's car had no lawful purpose—Metzger was simply attempting to confirm a hunch derived from a stale tip. He did not even have reasonable suspicion that Defendant would be transporting controlled substances to Kentucky in his vehicle. The only information that he had was an eight-month old tip from an informant regarding conduct that occurred over a year prior to the installation of the GPS device. Allowing the traffic violation to act as an intervening circumstance, under these facts, would allow police to escape the holding in *Jones* and would implicate the Sixth Circuit's concerns in *Gross*. Police, acting on a hunch or even less, would be able to install a GPS device on any vehicle, and if the data from the device revealed suspicious behavior, police could follow the vehicle with a canine unit in close proximity. Should the driver commit a traffic violation, police could then utilize their canine to perform an exterior search of the vehicle. If the canine does not alert, the police would be able to send the driver on her way with a traffic citation or even simply a warning, the driver would never know that she was being tracked, and the tracking could continue to hopefully be more productive another day. If the canine were to alert, the police could then argue that the attenuation doctrine allows for the admission of all evidence that resulted from the probable cause search that was conducted following the positive canine alert. This is the very post-hoc rationalization the Sixth Circuit condemned in *Gross*. Importantly, the Sixth Circuit indicated it did not wish to "create a system" of such rationalization given the "perverse incentives" that would result. This Court cannot allow that which the Sixth Circuit has intentionally deterred.

Thus, although the Court concludes that a traffic violation *may* be an intervening circumstance where the violation was not caused by or otherwise attributable to the actions of law enforcement, *Lopez*, 2011 WL 2636890, at *5, such a determination must be made on a case-by-case basis. Here, Hutti was told to develop his own probable cause after being told that Defendant's vehicle "probably" (D.E. 18 at 14) had marijuana in it, which hunch was derived directly from the use of the GPS data. The causal connection was not severed. Under the facts of this case, Defendant's traffic violation does not favor attenuation.

### c.            *Flagrancy of the Official Misconduct*

As a final factor, the Court must evaluate "the purpose and flagrancy of the official misconduct." *Hudson*, 547 U.S. at 592. In many cases, this is the "most important" factor in the attenuation analysis because "'it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct.'" *Shaw*, 464 F.3d at 630 (quoting *Reed*, 349 F.3d at 464-65). The United States argues that this case can be resolved by merely looking to whether the officers had sufficient probable cause to stop Defendant's vehicle. (D.E. 31 at 2-3). Relying upon *United States v. Street*, 614 F.3d 228 (6th Cir. 2010), the United States argues that the subjective motivations of the officers are irrelevant. (D.E. 31 at 2-3). However, the Government's reliance upon *Street* is misplaced. In *Street*, the court was analyzing the initial question of whether there was, in fact, a constitutional violation. *Street*, 614 F.3d at 232. As discussed above, *see supra* pp. 6-8, such an inquiry focuses on the "objective reality (or not) of whether the officers had probable cause to believe that a crime . . . had occurred," and not on "the subjective motives of the officer's actions," *Street*, 614 F.3d at 232. The Court has, consistent with this rule, concluded that the stop and subsequent search of Defendant's vehicle did not violate the Fourth Amendment.

Under the attenuation doctrine, the Court's inquiry is much different because application of the doctrine only follows a finding that Defendant's constitutional rights have been violated. As the Sixth Circuit has pointed out, "purpose matters" when assessing the "flagrancy of official misconduct." *United States v. Gross*, 662 F.3d 393, 404 (6th Cir. 2011). The Court must determine whether "the police acted in bad faith" and whether their conduct "demonstrate[s] the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent." *Shaw*, 464 F.3d at 631 (quoting *Reed*, 349 F.3d at 465).

In a somewhat analogous case, the Ninth Circuit held that an alert on a package by a trained canine was tainted by an earlier unlawful search of the package by law enforcement officers. *United States v. Taheri*, 648 F.2d 598, 600 (9th Cir. 1981). Specifically, a DEA agent, acting upon a tip, intercepted a package that was delivered to a motel. *Id.* at 599. The package had been damaged in the mail, and when the agent lifted the package, numerous folded paper bindles inside the package were revealed. *Id.* The agent removed a bindle causing a brown powder to fall out. *Id.* Testing on the powder showed that it was heroin. *Id.* At the direction of the U.S. Attorney, the agent brought a drug detection dog to the motel which, not surprisingly, alerted to the presence of drugs inside the package. *Id.* at 600. "The fact of the dog's alert, without mention of the earlier search of the package, was provided to a U.S. magistrate, who issued a search warrant. The agents then, armed with the warrant, returned to the motel, [and] seized 58 of the bindles . . . ." *Id.*

The defendant moved for the suppression of the heroin on grounds that it was discovered by means of an unlawful search of the package. *Id.* The United States argued that the "alert" by the drug detection dog purged the taint of the initial unlawful activity. *Id.* The Ninth Circuit held otherwise:

> In this case, the illegally gained knowledge that the substance in the package was heroin formed the impetus for the use of the detector dog.  The dog's alert therefore cannot be considered an independent source which removed the taint of the original illegal search.  The initial search was part of the same criminal investigation leading to this prosecution and revealed the same evidence which was the subject of the motion to suppress.

*Id.*  Evaluating the purpose of the exclusionary rule, the court cautioned that, "[t]o permit evidence to be admitted under these circumstances **would encourage police officers to ignore the dictates of the fourth amendment in conducting initial investigations**."  *Id.* (emphasis added).

The Sixth Circuit has held that conduct that is not flagrant can still weigh against attenuation, and that the purposefulness factor is "met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant "'in the hope that something might turn up[.]'"  *Williams*, 615 F.3d at 670 (quoting *Brown v. Illinois*, 422 U.S. 590, 605 (1975)).  Thus, the Sixth Circuit has identified the same concerns created by ignoring the dictates of the Fourth Amendment in initial investigations as did the Ninth Circuit in *Taheri*.  Here, the clear purpose of the installation of the GPS device was to monitor Defendant's movements hoping to find suspicious behavior.  During the first weekend, Defendant stayed in the Corbin, Kentucky area and, thus, Metzger did not take any action to stop Defendant's vehicle.  Metzger's suspicions were not raised until he tracked Defendant's vehicle to Chicago.  Detecting such movements set forth a chain of events that ultimately led to the discovery of Defendant's seat belt violation, the positive alert by Hutti's canine, and the contraband located in Defendant's vehicle, as well as Defendant's statements.  Simply put, Metzger and the other officers discovered the controlled substances by exploiting the illegality using means that were not "purged of the primary taint."  *See Wong Sun*, 371 U.S. at 488.  This factor also disfavors attenuation.

**2.      Attenuation does not apply and exclusion is warranted**

This is not a case where the acquisition of the GPS data merely caused the police to suspect Defendant of wrongdoing and subsequent investigations led to the discovery of the disputed evidence.  *See, e.g.*, *United States v. Friedland*, 441 F.2d 855, 861 (2d Cir. 1971) ("we do not accept the premise that if Best's squad was put on notice, through receipt of information obtained from illegal bugging, that Friedland was the sort of person who would bear watching, this alone would immunize him from investigation of different criminal activities and from prosecution on the basis of facts about them learned in a lawful way.").  Instead, it was the collection and use of the GPS data which directly led, without attenuation, to the stop and search of Defendant's vehicle.  Metzger received the pertinent data from the GPS tracker, interpreted the location in Chicago to indicate criminal activity, coordinated the stop with Hutti, advised Hutti that Defendant was suspected of transporting marijuana, and told Hutti he wanted Defendant stopped around Mount Vernon.  (Hr'g Tr. 14).  Ultimately, because Metzger obtained the GPS data through unlawful means and immediately exploited the data to learn Defendant's location so that Hutti could stop and search Defendant's vehicle, the fruit of the poisonous tree doctrine restricts the use of the evidence at issue at trial.

Undoubtedly, society is negatively impacted by the exclusion of reliable evidence of Defendant's guilt.  In this case, that impact is significant.  Given Defendant's prior felony drug conviction (D.E. 10), if convicted he faces at least 10 years incarceration, with a lifetime maximum – a Class A felony.   His Criminal History Category was previously determined to be VI (the highest possible under the United States Sentencing Guidelines) and then Defendant apparently engaged in significant marijuana trafficking while on supervised release imposed by a previous Judgment of this Court.  Society will certainly be negatively impacted if this case falls

apart and Defendant does not have to face the consequences of his serious criminal record and apparent continued criminal behavior.  However, such societal costs are outweighed by the need to deter officers from ignoring "the dictates of the fourth amendment in conducting initial investigations."  *Taheri*, 648 F.2d at 600.  Officers should not be permitted to install a GPS device on a vehicle without adequate cause, and then exploit the data at their convenience. The Supreme Court's pronouncement in *Jones* should certainly put law enforcement on notice that they are not permitted to do so.  However, the taint in cases like this would persist because, if officers could simply rely upon the attenuation doctrine to escape the holding in *Jones* or other Fourth Amendment requirements, the door would be opened for the "perverse incentives" and impermissible "post-hoc rationalizations" the Sixth Circuit sought to avoid in *Gross*.

### D.   No Good Faith Exception to the Exclusionary Rule Applies

Citing *Davis*, the United States also argues that law enforcement officers were acting in good faith upon binding appellate precedent when they installed the GPS tracker and that, under such circumstances, the exclusionary rule is not an appropriate remedy.  (D.E. 31 at 3-5). However, the rule announced in *Davis* is not applicable here.

In *Davis*, the Supreme Court recognized that confusion had been created in the lower courts over the proper application of its decision in *New York v. Belton*, 453 U.S. 454 (1981), a case addressing the search-incident-to-arrest exception to the warrant requirement.  *Davis*, 131 S. Ct. at 2424.  The Eleventh Circuit, for example, "had long read *Belton* to establish a bright-line rule authorizing substantially contemporaneous vehicle searches incident to arrests of recent occupants."  *Id.* at 2426 (citing *United States v. Gonzalez,* 71 F.3d 819, 822, 824–27 (11th Cir. 1996)).  In 2007, a police officer within the Eleventh Circuit arrested the occupants of a vehicle and secured them in separate police cruisers.  *Id.* at 2425.  The officer searched the passenger

compartment of the occupants' vehicle and discovered a firearm.  *Id.*  Pursuant to *Gonzalez*, the trial court denied the defendant's motion to suppress.  *Id.* at 2426.  While the case was pending on appeal, however, the Supreme Court announced, in *Arizona v. Gant*, 556 U.S. 332 (2009), "that *Belton*'s holding applies only where 'the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'"  *Davis*, 131 S. Ct. at 2425 (quoting *Gant*, 556 U.S. at 343).  Although the Eleventh Circuit concluded that the defendant's rights under the Fourth Amendment were violated, it "declined to apply the exclusionary rule and affirmed Davis's conviction."  *Id.* at 2426.  The Supreme Court affirmed.

The Court reasoned that "the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'"  *Id.* at 2429 (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).  "An officer who conducts a search in reliance on binding appellate precedent does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances."  *Id.* (quoting *Leon*, 468 U.S. at 920).  The Court specifically noted, however, that "[t]he search incident to Davis's arrest . . . **followed the Eleventh Circuit's *Gonzalez* precedent to the letter**."  *Id.* at 2428 (emphasis added).  Additionally, the Court mentioned that "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way."  *Id.*  The exclusionary rule, which is not designed to deter an appellate court's error, does not apply under such circumstances.  *Id.* at 2428-29.  But to justify suspension of the exclusionary rule, the applicable "precedent on a given point must be **unequivocal**."  *United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) (quotation omitted) (emphasis added); *see also Davis*, 131 S. Ct. at 2345 (Sotomayor, J., concurring) (stating "[w]hether exclusion would deter Fourth Amendment violations where appellate precedent does not

specifically authorize a certain practice and, if so, whether the benefits of exclusion would outweigh its costs are questions unanswered by our previous decisions.").

Here, however, the United States has pointed to no binding appellate precedent unequivocally authorizing the installation of the GPS device on Defendant's vehicle to bring this matter within the purview of *Davis*. Quite apart from the reliance upon the "bright-line" binding Eleventh Circuit precedent at issue in *Davis*, the United States cobbles together various principles identified by the Supreme Court—instead of black letter rules—to argue law enforcement acted in good faith so as to avoid suppression. The United States relies heavily on the combination of *Katz v. United States*, 389 U.S. 347 (1967) and *United States v. Knotts*, 460 U.S. 276 (1983), to create a "rule" that warrantless electronic tracking of a Defendant's movement on public thoroughfares is constitutionally permissible, allowing the installation of the GPS tracker on Defendant's car pre-*Jones*. But no such "unequivocal" rule was established by the Supreme Court prior to *Jones*.[8]

In truth, the opinion in *Knotts* is specifically limited and qualified. The Court's analysis in *Knotts* emphasized the "limited" use made by the government of the beeper tracking signal therein. *Knotts*, 460 U.S. at 284. More importantly, the Court in *Knotts* reserved the future question of the constitutional impact of technological enhancements to the beeper technology involved. *See id.* (addressing the risk of potential abuse in twenty-four hour surveillance without judicial supervision or knowledge by indicating "if such dragnet-type law enforcement practices as respondent envisions should eventually occur, **there will be time enough then** to determine

---

[8]     According to the Supreme Court, *Jones* does not create new law. The majority opinion in *Jones* stated that it "had no doubt" that a "physical[] occup[ation] of private property for the purpose of obtaining information" would have been "considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Jones*, 132 S. Ct. at 949. In fact, "[c]onsistent with this understanding, [the Supreme Court's] Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century." *Id.*

whether different constitutional principles **may** be applicable." (emphasis added)).  Years later, the Sixth Circuit relied upon the "rationale" in *Knotts* to hold that the use of cell-site data to track a defendant's movements "only on public highways" did not invade any legitimate expectation of privacy.  *United States v. Forest*, 355 F.3d. 942, 951 (6th Cir. 2004).[9]  But the *Forest* case did not involve a physical trespass or any installation of a device on a suspect's property; instead law enforcement was using a cellular provider (Sprint) to access cell-site location data generated by the suspect's cellular phone to reveal the general location of the suspect.  *Id*. at 947.  Thus, the applicable law on the installation and use of electronic tracking devices was not sufficiently unequivocal prior to *Jones* to avoid suppression under *Davis*.

The United States argues that "[b]efore *Jones*, every circuit that considered the issue concluded that the attachment of an electronic tracking device to the exterior of a vehicle parked in a public place did not constitute a 4th Amendment search."  (D.E. 31 at 4).  However, that is not accurate.  First, the District of Columbia Circuit specifically held otherwise in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), which is the decision that was appealed and affirmed by *Jones*, and which was issued more than a year before the deployment of the tracking device on Defendant's vehicle.  *Maynard* specifically relied upon the qualified nature of *Knotts*

---

[9]      Notably, the United States did not rely upon *Forest* in support of its good faith argument until directed to brief its impact upon Defendant's motion.  (D.E. 25).  It is therefore a stretch, to say the least, that law enforcement acted in good faith reliance on this case when deciding to install the GPS tracker.

Furthermore, additional Sixth Circuit law concerning warrantless electronic surveillance shows a lack of unequivocal, binding appellate precedent.  In *United States v. Cassity*, 631 F.2d 461 (6th Cir. 1980), the district court held that "the use of a beeper is no more than a sophisticated substitute for visual surveillance and does not require a warrant."  *Cassity*, 631 F.2d at 464.  On appeal, the Sixth Circuit vacated the defendant's conviction, remanded for a suppression hearing, and noted that "[o]ur decision in *United States v. Bailey*, 628 F.2d 938 (6th Cir. 1980), undercut this ruling of the district court by holding beeper surveillance may invade an individual's legitimate expectations of privacy and, therefore, require a warrant."  *Id*. at 464.  In fact, the *Bailey* decision went so far as to say that "the installation and monitoring of the beeper under the facts of this case was a 'search' or 'seizure' and had to meet fourth amendment standards."  *Bailey*, 628 F.2d at 944-45.  Although the *Bailey* case predated *Knotts*, the Sixth Circuit later held that *Knotts* does not affect our decisions in either *Bailey or Cassity*[.]"  *United States v. Cassity*, 720 F.2d 451, 454 (6th Cir. 1983).

described above.  *Maynard*, 615 F.3d at 556; *id.* at 558 (stating "in *Knotts* the Court actually reserved the issue of prolonged surveillance.").

Additionally, in *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), DEA agents placed a beeper on the undercarriage of a U-Haul van while the van was parked in a parking lot of a shopping center.  *Moore*, 562 F.2d at 108.  The agents then used the beeper to track the vehicle's movements on public roadways.  *Id.*  The First Circuit held that using a beeper "to keep track of the motor vehicle[] . . . intruded to some degree upon defendants' reasonable privacy expectations[.]"  *Id.* at 111.

> We conclude that while the intrusion involved in surveillance of a vehicle by beeper is considerably lessened by the fact that one driving on public roads knows that he is subject to public scrutiny, still the intrusion cannot be written off as non-existent.  And even though searches of automobiles often present exigent circumstances that permit the Government to dispense with warrants, it does not follow that searches coming within this exception can be conducted in all situations at the unlimited discretion of the police.  The fourth amendment still places clear limits on official behavior in this context.

*Id.* at 112 (internal citation omitted).  Thus, prior to Metzger's installation of the GPS device at issue in this case, at least two circuits had called into question the ability of officers to install an electronic tracking device on a vehicle, even when that vehicle was parked in a public place.

The United States points out that Metzger believed he was complying with the Fourth Amendment when he installed and used the GPS device to track Defendant's movements.  (D.E. 31 at 5).  That may be, but it is reliance upon unequivocal, binding appellate precedent that avoids suppression – not reliance on a mistaken legal interpretation.  Although not formally offered into evidence, the DEA apparently had a national procedure authorizing the warrantless installation of a tracking device in a public area.  (*Id.*).  "However, the fourth amendment requires more than good faith; it requires observance of procedures designed to ensure that the search or seizure authorized by the warrant is reasonable."  *Bailey*, 628 F.2d at 947.

Furthermore, "electronic surveillance has such a potential for abuse that the Government must be held accountable for its use.  To hold the exclusionary rule inapplicable under the facts of this case would place fourth amendment protections solely under the control of the Executive Department of the Government and would constitute judicial abdication." *Id.*; *see also Cassity*, 631 F.3d at 464 ("In *Bailey* we also decided that suppressing the fruits of the monitoring is the appropriate judicial response to illegal beeper surveillance.").

The mistake in this case was made by law enforcement by cherry-picking favorable (but not unequivocal) precedent to create a rule that allowed for warrantless installation of a tracking device.  Essentially this was an attempt by the executive branch to answer the constitutional question specifically reserved by the judiciary in *Knotts*.  This is far different than a mistake made by the Sixth Circuit, a legislature, or an independent judicial officer, and good faith reliance by law enforcement in turn.  *Davis/Buford* allows for good faith reliance upon appellate precedent in the limited circumstances described above.  *Illinois v. Krull*, 480 U.S. 340 (1987) allows for good faith reliance upon subsequently invalidated statutes.  *United States v. Leon*, 468 U.S. 897 (1984) allows for objectively reasonable reliance on a warrant later held invalid.  None of these exceptions apply in this case, and, of course, this Court cannot expand the scope of *Davis/Buford*.

In short, "[w]hen law enforcement officers rely on precedent to resolve legal questions as to which reasonable minds may differ, the exclusionary rule is well-tailored to hold them accountable for their mistakes."  *United States v. Davis*, 598 F.3d 1259, 1267 (11th Cir. 2010) (quotation and internal markings omitted).  Here, reasonable minds may differ about the appropriate interpretation of appellate precedent that existed prior to the *Jones* decision.  However, the role of law enforcement is to enforce the law, not to interpret it.  Having

26

interpreted the law incorrectly and relying upon that error to decide not to seek a warrant at any point during their investigation, the operation of the exclusionary rule is not suspended.

### E.   Conclusion

Metzger violated Defendant's Fourth Amendment rights when he installed a GPS tracker and then monitored Defendant's movements for four days thereafter.  The stop of Defendant's automobile, the search of his automobile, and his subsequent arrest, were all tainted by the unlawful search.  Therefore, the United States should be prohibited from introducing the GPS data, the contraband, Defendant's statements, and all testimony related thereto, at trial.

### IV.   RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that the District Court **GRANT** Defendant's motion to suppress.  (D.E. 13).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  As defined by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 22nd day of March, 2012.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge